**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

GREGG BOGOSIAN and THADOSHA
BOGOSIAN and A.B.,
a minor child, by and through her parents
and natural guardians, Gregg Bogosian and
Thadosha Bogosian,

        Plaintiffs

    v.                                C.A. No. 14-080-ML

RHODE ISLAND AIRPORT CORPORATION
(T.F. GREENE AIRPORT); OFFICER STEPHEN E.
REIS; SERGEANT CHARLES E. HALL;
OFFICER JOHN KINGSTON; and OFFICER
JOHN DOE,

        Defendants

**MEMORANDUM AND ORDER**

The matter before the Court is the Defendants' motion for sanctions against the Plaintiff, Gregg Bogosian ("Bogosian") for alleged violations of a protective order issued by this Court on March 31, 2014 (the "Protective Order," Dkt. No. 10). For the reasons set forth herein, the Defendants' motion is DENIED.

## I. Factual Background and Procedural History

This case arose from an incident that took place at the T.F. Greene Airport (the "Airport") on the afternoon of July 31, 2012. Although the parties disagree about the exact sequence and details of the events, there are some facts that appear undisputed. On that

1

day, Bogosian drove his car to the Airport, where he dropped off his wife, daughter, and mother-in-law at the departure area on the upper level. Bogosian left the departure area briefly, and then returned to that area to wait for his wife and daughter to re-emerge from the Airport terminal. At some point, Bogosian was told by Airport police that he could not remain in the departure area's clearly marked loading and unloading zone. Bogosian then proceeded to the arrival area at the lower level of the Airport, where he again parked in a marked loading and unloading zone. Shortly after his arrival, Bogosian was approached by a uniformed Airport police officer. Bogosian was unresponsive to the officer's inquiry and, when asked to produce his license and registration, he did not do so; instead, Bogosian called 911 on his cell phone. Bogosian was subsequently placed under arrest and escorted to the Airport police station. He was charged with obstruction of justice and disorderly conduct and he was given a traffic ticket. The traffic violations were subsequently dismissed based on Bogosian's good driving record. The criminal charges were dismissed on December 6, 2012.

On January 14, 2014, Bogosian filed a nine-count complaint (the "Complaint") in Rhode Island state court, alleging, *inter alia*, wrongful arrest and assault and battery (Dkt. No. 1-2). Because the Complaint also contained allegations of illegal search and seizure in violation of the Fourth Amendment, the case was removed by the Defendants to this Court on February 11, 2014.

Following a Rule 16 conference, the parties proceeded to discovery pursuant to a pretrial scheduling order issued on March 7, 2014 (Dkt. No. 7). On March 20, the parties filed a joint motion for entry of a protective order (Dkt. No. 9) to protect confidential information produced during discovery from unnecessary disclosure. The motion was granted on March 21, 2014 (Dkt. No. 10).

On March 31, 2015, following certain events, the Defendants filed a motion for sanctions against Bogosian for alleged violations of the Protective Order (Dkt. No. 47) pursuant to Fed. R. Civ. P. 37(b)(2)(A). Bogosian objected to the Defendants' motion (Dkt. 54), to which the Defendants filed a reply (Dkt. 57). The Court conducted an evidentiary hearing on the matter on April 29, 2015 and May 8, 2015, after which it took the Defendants' motion under advisement.

**II. Standard of Review**

Pursuant to Rule 37, the court may impose a variety of sanctions against a party for violation of a discovery order, including the entry of a default judgment against the disobedient party. Fed. R. Civ. P. 37(b)(2)(A). Such sanctions may be imposed by the Court "both to penalize the particular noncompliance and to deter others from engaging in the same tactics." AngioDynamics, Inc. v. Biolitec AG, 780 F.3d 429, 435 (1st Cir. 2015); Companion Health Services, Inc. v. Kurtz, 675 F.3d 75, 84 (1st Cir. 2012)(Noting that "the goal of a sanction is both to penalize

3

wrongful conduct and to deter future similar conduct by the particular party and others 'who might be tempted to such conduct in the absence of such a deterrent.'")(internal citation omitted).

The First Circuit has provided a non-exhaustive list of substantive and procedural factors to be considered in determining a motion for sanctions. They include (1) severity of the discovery violations, (2) legitimacy of the party's excuse for failing to comply, (3) repetition of violations, (4) deliberateness of the misconduct, (5) mitigating excuses, (6) prejudice to the other party and to the operations of the court, and (7) adequacy of lesser sanctions. AngioDynamics, Inc. v. Biolitec AG, 780 F.3d at 435 (citing Vallejo v. Santini-Padilla, 607 F.3d 1, 8 (1st Cir.2010)).In addition, "[p]ertinent procedural considerations include 'whether the offending party was given sufficient notice and opportunity to explain its noncompliance or argue for a lesser penalty." Vallejo v. Santini-Padilla, 607 F.3d at 8 (quoting Malloy v. WM Specialty Mortgage, 512 F.3d 23, 26 (1st Cir.2008) (per curiam)). The party seeking the imposition of sanctions bears the burden of proof. *See* 8A C. Wright, A. Miller & R. Marcus, Federal Practice and Procedure § 2291, at 716 (2d ed. 1994).

**III.    The Protective Order**

Under the Protective Order, the parties are entitled to (1) designate as "CONFIDENTIAL" any document or material which a party believes to contain confidential information, and (2) designate as

4

"ATTORNEYS EYES ONLY" any document or material which a party believes to contain "highly confidential, highly sensitive personal information, trade secrets, or other sensitive and/or security information." Protective Order at 1 (Dkt. No. 10). The disclosure of information and/or material designated as "CONFIDENTIAL" or "ATTORNEYS EYES ONLY" is strictly limited to the parties, their attorneys, and certain other individuals directly involved in the litigation process in their professional capacity. The two documents at issue in this motion are the résumé of Defendant Sergeant Charles E. Hall ("Sergeant Hall") and the transcript of his December 15, 2014 deposition, both of which were marked "CONFIDENTIAL."

**IV. The Parties' Positions**

According to the Defendants, on January 24, 2015, around 3:00 a.m., Bogosian contacted a Martha's Vineyard police department where Sergeant Hall had been employed more than thirty years previously. Bogosian asked a number of questions about a 1981 incident during Sergeant Hall's employment there. In the course of a telephone conversation with Officer Dustin Shaw ("Officer Shaw"), a police officer in that department, Bogosian disclosed information which, the Defendants assert, was contained in Sergeant Hall's

résumé and/or the transcript of his deposition[1], both of which had been designated "CONFIDENTIAL." Officer Shaw advised Bogosian to call back during normal business hours when he could speak to the records clerk regarding past employees. Transcript from 04/29/15 Evidentiary Hearing (TR I) 63:21-24. It is undisputed that Bogosian never called back.

Officer Shaw, concerned about the nature of the call, conducted an internet search on Bogosian and Sergeant Hall and, when he learned of the pending litigation, he informed the Rhode Island Airport Police about the call. In addition, he prepared an incident report on the event. The Defendants, after repeated attempts to confer with Bogosian's counsel, filed the instant motion, seeking (1) a hearing to question Bogosian about the extent of the information disclosure, and (2) attorneys' fees for investigating the nature of Bogosian's disclosures.

Bogosian, in objecting to the Defendants' motion, asserts that he obtained information concerning Sergeant Hall's past employment in 2012, prior to imposition of the Protective Order and, therefore, excepted therefrom. Pltfs' Obj. at 4 (Dkt. No. 53). Bogosian further asserts that he located the information "through internet searches and various newspaper articles, all of which are

---

[1] Although the deposition took place on December 15, 2014, the transcript was not made available to the parties until January 5, 2015.

accessible to the general public and are therefore public knowledge." Id. He also notes that the résumé was not designated as "CONFIDENTIAL" when it was first produced in discovery, but only when it was attached as an exhibit to Sergeant Hall's deposition, taken on December 15, 2014. In support of his objection, Bogosian submits photocopies of several newspaper clippings about the 1981 events that occurred on Martha's Vineyard; an affidavit in which Bogosian reiterates that he obtained the information about Sergeant Hall in 2012; a number of Rhode Island newspaper articles in which reference is made to Sergeant Hall's employment in East Providence (and which are entirely unrelated to the motion); and affidavits from Bogosian's prior attorneys who confirm that they did not provide their client with copies of Sergeant Hall's deposition transcript (only one of the attorneys makes the same assertion with respect to the résumé).

## V. The Evidentiary Hearing

### 1. Officer Shaw's Testimony[2]

Officer Shaw, whose testimony was clear, concise, and unequivocal, recounted that he received a call from Bogosian on January 24, 2015 at 2:50 a.m. TR I at 60:13-22. Bogosian inquired

---

[2]

To allow Officer Shaw to return to his post, his testimony was presented about halfway through Bogosian's direct examination. For ease of following the hearing, Officer Shaw's testimony is summarized first.

whether Sergeant Hall had been employed by the department in the early 1980s. TR I 63:8-19. According to Shaw, Bogosian stated that he was doing a background check for employment purposes. TR I 64:2-4. Bogosian then made reference to ███████████████████████████████████████████████████████████ and he disclosed a number of details of that incident to Sergeant Hall. TR I 64:8-66:10. Upon inquiry by Officer Shaw, Bogosian represented that he was working for "Rhode Island," and, when asked to clarify, responded with "Federal Government." TR I 69:22-70:14. Bogosian told Officer Shaw that he had a relative with the Massachusetts State Police who was also looking into Sergeant Hall's background. TR I 70:15-25. Bogosian also related to Officer Shaw that he had Sergeant Hall's résumé. TR I 71:25-72:12.

Officer Shaw described Bogosian as appearing suspicious in nature, and evasive when asked a question. TR I 71:17-24. Shortly after the call concluded, Officer Shaw prepared an incident CAD [computer assisted dispatch] report. TR I 61:11-63:4. Because he was concerned about Bogosian's behavior on the phone, Officer Shaw also performed a Google search on Bogosian's name and found the information regarding litigation involving the T.F. Greene airport. TR I 73:6-12. Given the early morning hours of the call and the type of questions posed by Bogosian, Officer Shaw then contacted the Airport Police Department and advised that department of what had transpired. TR I 73:12-17.

## 2. Bogosian's Testimony

According to Bogosian, he obtained three newspaper articles ██████████████████████████████████████ when Bogosian researched the background of the Defendant police officers after he was arrested at the Airport on July 31, 2012. TR I 6:3-16. Bogosian was unable to state from which newspaper any of the articles were taken. He maintained that they came from "the archives," TR I 6:22-25, but could not clarify which archives he meant, nor could he recall whether he had found them on the internet, which search engine or search terms he may have used, or whether he received the articles from the Providence Public Library. TR I 7:1-20:23; Transcript from 05/08/15 Evidentiary Hearing ("TR II") 64:11-65:19. According to Bogosian, he obtained printed copies of the clipped articles from the internet where they had been uploaded by someone. Bogosian then printed the articles from a computer other than his own, possibly the Providence Public Library computer. TR I 20:11-23.

As to handwritten dates on all three articles, Bogosian stated that he did not know who had written them, but that the articles were as they appeared on the internet. TR I 21:3-20. Bogosian conceded that he had no records as to how he found the articles in 2012. TR I 21:24-22:16. According to Bogosian, he gave the articles to his former attorneys in or about March or April 2015 or, possibly, prior to Sergeant Hall's deposition in December 2014. TR

9

I 23:7-25:9. Bogosian also stated that his former attorneys never brought to his attention that the Defendants had expressed a concern about Bogosian's early morning call to Officer Shaw. TR I 28:19-23.

Bogosian made the call to Sergeant Hall's former employer on Martha's Vineyard on January 24, 2015, at around 3:00 a.m., three days after an unsuccessful settlement conference in the case. TR I 33:4-21. According to Bogosian, notwithstanding his statement in an affidavit to the contrary, he did not know that Sergeant Hall had been deposed on December 15, 2014, about six weeks before the call. TR I 36:15-37:17.

Bogosian's version of the late night/early morning call differed significantly from that testified to by Officer Shaw and set forth in the incident report[3] Officer Shaw prepared within an hour of talking to Bogosian. Exh. F. Bogosian "absolutely" denied telling Officer Shaw that he was conducting a background investigation of Sergeant Hall, TR I 42:18-24, although he also expressed that he was allowed to "research the background of people that falsely arrested me." TR I 45:11-21. Although Bogosian denied having made certain statements to Officer Shaw, he did reluctantly

---

[3] Bogosian described the police report as "false" and stated that, although he had not yet done so, he intended to do something in response to that. TR I 42:5-15.

concede that he had discussed with Officer Shaw ████████████████████████████████████████████████████████████████. TR I 46:25-53:7.

Bogosian was adamant that he had never seen Sergeant Hall's résumé, TR I 55:2, although he allowed that he may have seen it attached to the Defendants' motion for sanctions. TR I 56:22-25. He also denied telling Officer Shaw that he had a copy of the résumé. TR I 57:3-5. In his affidavit submitted in support of his objection to the Defendants' motion for sanctions, Bogosian acknowledged that he was first made aware of the résumé in September 2014, when it was produced in discovery, but he took the position that the résumé was not subject to the protective order. TR I 57:6-23; Exh. B ¶¶ 12, 13.

Bogosian denied telling Officer Shaw that he, Bogosian, had a family member in the Massachusetts State Police who would look into Sergeant Hall's background or that he had talked to anyone else in law enforcement about the matter. TR II 22:8-19. Bogosian also denied representing to Officer Shaw that he worked for the Federal Government, although he maintained at the evidentiary hearing that he had been an employee of the Federal Government at some point. TR II 25:24-27:2.

**VI. Discussion**

The Defendants seek sanctions against Bogosian for allegedly violating the March 31, 2014 Protective Order put in place in this

11

litigation. The motion is based on Bogosian's early morning phone call to another police department where Bogosian, in an apparent attempt to gather information about Sergeant Hall, disclosed a number of facts that were contained in Sergeant Hall's résumé and/or the transcript of his deposition. Both of those documents had been marked "CONFIDENTIAL" and were subject to the Protective Order. On his part, Bogosian, who denies much of the conversation he had with Officer Shaw, insists that any information he disseminated was the result of conducting internet research through which he located a number of newspaper articles available to the public.

As noted by this Court at the conclusion of the evidentiary hearing in this matter, Bogosian's conduct as well as the evasive nature of his testimony give the Court pause. Bogosian flatly denied making statements that Officer Shaw, a police officer unconnected with this litigation, testified to and which he also set forth in his official police report and his sworn affidavit. The Court also expressed its doubts about Bogosian's motivation in making a 3:00 a.m. inquiry, yet not calling back during business hours as he was advised to do by Officer Shaw.

Nevertheless, even if the Court were to credit only Officer Shaw's version of the events, there is no conclusive proof that Bogosian was in actual possession of the transcript and/or the résumé when he made that call. All the details Bogosian discussed

with Officer Shaw can be found in the newspaper clippings which Bogosian purportedly located in the course of his internet research. In light of Bogosian's inability to recall how, when, and where he found those articles, the Court has some concerns about the source of the materials and the methodology of Bogosian's research. The Defendants, however, have the burden in this matter, and there was no testimony establishing that the research described by Bogosian could not have yielded the results he claims to have located. Accordingly, the Court is unable to conclude that the conversation Bogosian had with Officer Shaw was the result of a violation of the Protective Order.

## Conclusion

For the reasons stated herein, the Defendants' motion for sanctions is DENIED. The Plaintiff is admonished, however, that he is to maintain confidentiality of any and all documents or other materials that are marked "CONFIDENTIAL" in this case.

SO ORDERED.

/s/ Mary M. Lisi

Mary M. Lisi
United States District Judge

June 5, 2015