UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

GREGG BOGOSIAN and THADOSHA
BOGOSIAN and A.B.,
a minor child, by and through her parents
and natural guardians, Gregg Bogosian and
Thadosha Bogosian,

        Plaintiffs

      v.                                      C.A. No. 14-080-ML

RHODE ISLAND AIRPORT CORPORATION
(T.F. GREEN AIRPORT); OFFICER STEPHEN E.
REIS; SERGEANT CHARLES E. HALL;
OFFICER JOHN KINGSTON; and OFFICER
JOHN DOE,

        Defendants

**MEMORANDUM AND ORDER**

Following his arrest and brief detainment at the T.F. Green Airport (the "Airport") in Warwick, Rhode Island, Gregg Bogosian, ("Bogosian"), together with his wife Thadosha and on behalf of their minor child, A.B., (together, the "Plaintiffs") filed a nine-count complaint (the "Complaint")(ECF 1-2) in Rhode Island state court, alleging, *inter alia*, wrongful arrest and assault and battery. Because the Complaint also asserted claims of illegal search and seizure in violation of the Fourth Amendment, the Defendants, the Airport and the officers of the Airport Police Department, removed the case to this Court.

1

After a long and contentious discovery period, during which the Plaintiffs dismissed their first set of attorneys and engaged new counsel, the Defendants filed a motion for summary judgment (ECF No. 33). While the Defendants' motion was pending, the Plaintiffs terminated their second set of attorneys and engaged new successor counsel to pursue their claims.

After the parties' respective positions had been briefed, the Court conducted a hearing on the Defendants' motion, in the course of which it dismissed Counts V, VI, and IX (Wrongful Arrest and Imprisonment, Malicious Prosecution, and Illegal Search and Seizure) and denied the Defendants' motion as to Counts I, II, III, IV, and VII (Intentional Infliction of Emotional Distress, Negligent Infliction of Emotional Distress, Deprivation of Privacy, Assault and Battery, and Loss of Consortium). (ECF No. 72).

Both parties filed appeals (ECF Nos. 74, 80). While the appeals were pending, the Plaintiffs once again terminated the services of their counsel and continued to proceed *pro se.* (ECF Nos. 87, 94). The Plaintiffs' appeal was subsequently dismissed for lack of jurisdiction (ECF No. 89). Because the Plaintiffs, who are not attorneys, could not represent the interests of their minor child, the case as to the minor Plaintiff, A.B., was dismissed as well (ECF No. 99).

Subsequently, the First Circuit Court of Appeals concluded that summary judgment shall enter in the Defendants' favor as to

Counts I, II, and III (Intentional Infliction of Emotional Distress, Negligent Infliction of Emotional Distress, and Deprivation of Privacy) and remanded the case to this Court for further proceedings as to the assault and battery claim and the related loss-of-consortium claim)(ECF No. 112).

The matter now before the Court is a determination on Gregg Bogosian's claim of assault and battery based on allegations of excessive force, when considered in the context of the Defendants' qualified immunity defense, as well as the related claim of loss of consortium asserted by Thadosha Bogosian.

I. **Summary of Facts**[1]

The background against which the events leading to this litigation occurred are, for the most part, undisputed. The T.F. Green Airport is operated by Defendant Rhode Island Airport Corporation ("RIAC"), a quasi-governmental entity. SUF ¶1. The Rhode Island Airport Police, a department of RIAC, is a police force with the same powers as any Rhode Island municipal police agency. SUF ¶2. RIAC police officers, who wear standard police uniforms with badges, patches, and equipment, and who drive police SUVs marked "POLICE" equipped with standard police lights, are empowered to enforce traffic laws on Airport property, investigate

---

[1] The summary of facts is based primarily on the Defendants' Statement of Undisputed Facts ("SUF"), to the extent the Plaintiffs have not raised relevant objections thereto.

3

crimes, detain suspects, and make arrests. SUF ¶¶3,4. RIAC officers are responsible for ensuring that drivers abide by all traffic signs and regulations on airport property, and they have the right to request a driver's license and registration. SUF ¶¶5, 6.

The Airport has its own Homeland Security-mandated security plan, for which RIAC Airport Police must ensure compliance. SUF ¶8. Since the 9/11 attacks in 2001, the Airport property remains a sensitive security area. SUF ¶7. To ensure the continuing security and safety of the public and overall management of the Airport roadways, there are strict traffic control requirements, especially in the upper level Departures area and the lower level Arrivals area, that prohibit any vehicles from parking, waiting, or otherwise standing at the terminals. SUF ¶10.

Following September 11, 2001, the FAA also implemented a rule that cars cannot be parked within 300 feet of a terminal building. SUF ¶11. To advise drivers that travel lanes adjacent to the terminal building are only for active loading and unloading of passengers and baggage, there are multiple signs in both Arrivals and Departures roadways. SUF ¶12. The signs inform drivers that they cannot park or wait for passengers in those areas. SUF ¶13.

According to the Defendants, "[e]ven where a handicap sign exists in the Arrivals and Departure roadways, there is no stopping, parking or waiting; rather, a vehicle with a handicap placard can only actively load or unload passengers or baggage."

4

SUF ¶14. In response, the Plaintiffs have argued that "in essence, whatever the meaning of the handicap sign, it is not enforced by Officer Reis in his experience." Statement of Disputed Facts ¶14 (ECF No. 59). Nothing in their response, however, indicates the Plaintiffs' understanding that vehicles with a handicap placard may use the marked area for anything but active loading and unloading. Id.

On July 31, 2012, Bogosian drove his wife Thadosha, their child, and his mother-in-law to the Airport to drop off his mother-in-law for a flight. SUF ¶16. As Bogosian acknowledged during his deposition, he was aware at that time that the Airport was a sensitive security area, that security was a priority at the Airport, and that he had to abide by Airport traffic signs. SUF ¶17, 18, 22. After dropping off his family, Bogosian went to a nearby coffee shop and then returned to the Departures area to pick up his wife and child. SUF ¶19. Bogosian parked at the far end of the Departures roadway. SUF ¶20. Bogosian maintains that there were no signs in front of the terminal where he waited for his wife and child, he also insists that they were walking through the terminal doors and toward the exit as he was parked. SDF ¶¶21, 23-25. Bogosian does not deny, however, that at the time he stopped, he was alone in the car, waiting for his wife; nor does he assert that passengers were getting in or out of his car or that he was in the process of unloading or loading baggage. SUF ¶¶23, 24. On their

5

part, the Defendants maintain that there were multiple signs along the roadway, including the area where Bogosian had stopped his car. SUF ¶21.

While Bogosian was stopped, RIAC Police Officer Steven Reis ("Officer Reis"), wearing a full police uniform and driving an SUV marked "POLICE," approached Bogosian's car and determined that Bogosian had violated Rhode Island law prohibiting stopping in a tow zone and parking and waiting while not actively loading or unloading. SUF ¶¶26, 27. According to Bogosian, he did not realize that Officer Reis was a police officer and also did not notice that the SUV was marked "POLICE." SDF ¶26.

Although Bogosian takes issue with some of the details of the facts presented by the Defendants, it is undisputed that Bogosian did not move his car when he was repeatedly asked to do so , SUF ¶¶30, 32, and that Bogosian, after some interaction with Officer Reis,[2] then drove to the lower level Arrivals area, where he stopped in an area with signs designated for drivers with handicap placards to actively load and unload. SUF ¶38. Bogosian does not deny that, in addition to the other signage in the area, there was a bright orange sandwich board in the approach to the handicap area that stated: "No Waiting, Active Loading Only, $85 fine;" he does

---

[2] According to Bogosian, in response to Officer Reis "flipping him off" in his car, Bogosian gave Officer Reis the finger and then shouted "No, you go F yourself." SUF ¶37.

6

insist, however, that he does not recall seeing the board on the day in question. SDF ¶¶41-42. And, although Bogosian admits to seeing a handicap sign, he maintains that he does not recall the sign located within sight of where he stopped his car, which indicated: "No Waiting, Active Loading and Unloading of Passengers Only". SUF ¶47, SDF ¶47.

Further, it is undisputed that, as when Bogosian was stopped in the Departures area earlier on, no passengers were getting in or out of Bogosian's car while he was stopped in the Arrivals area, nor was he loading or unloading baggage. SUF ¶52. As supported by video of the incident, at the time Bogosian was stopped, the Arrivals area was busy with traffic and pedestrians and in the area of the handicap sign there were at least five people, some with baggage, including a passenger in a wheelchair with a prosthetic leg. SUF ¶¶44-46.

Officer Reis approached Bogosian's car for a second time, knocked on the car window and, when there was no response, opened the car door and asked Bogosian for his license and registration. SUF ¶58. Bogosian concedes that police officers have a right to ask a motorist for license and registration, and that he must obey specific instructions from police officers even if he disagrees with them. SUF ¶62. Although Bogosian maintains that he was not given sufficient time to comply with Officer Reis's instructions, it is undisputed that Bogosian never identified himself and that he

7

did not provide his license and registration, nor did he put his vehicle in park as instructed. SUF ¶65. Instead, Bogosian stated to Officer Reis that he had "every right to be here" and that he had a handicap placard. SUF ¶67.

Officer Reis then called for Sergeant Hall, his supervisor, who also requested that Bogosian produce his license and registration. Instead of complying with this request, Bogosian called 911 and asked to be connected to the Superintendent of the Rhode Island State Police because he felt he was being "harassed" at the Airport. SUF ¶78. Eventually, Bogosian was placed under arrest and charged with obstruction of justice in violation of R.I. Gen. Laws §11-32-1 and disorderly conduct in violation of R.I. Gen. Laws §11-45-1; he also received a traffic ticket for parking in a no parking zone and for failure to wear a seatbelt. SUF ¶¶108-110. Bogosian was held in RIAC police custody for three hours and then released. SUF ¶111. The criminal charges against Bogosian were eventually dismissed by the Attorney General. SUF ¶117. The traffic violations were dismissed based upon Bogosian's good driving record and payment of court costs. ¶118.

## II. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence about the fact is such

8

that a reasonable jury could resolve the point in the favor of the non-moving party." Prescott v. Higgins, 538 F.3d 32, 40 (1st Cir. 2008) (internal quotation marks and citations omitted). "A fact is material if it has the potential of determining the outcome of the litigation." Id. (quoting Maymi v. Puerto Rico Ports Auth., 515 F.3d 20, 25 (1st Cir. 2008).

The party seeking summary judgment bears the burden of establishing the lack of a genuine issue of material fact. Merchants Ins. Co. of New Hampshire, Inc. v. U.S. Fidelity and Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998). "Once such a showing is made, 'the burden shifts to the nonmoving party, who must, with respect to each issue on which [it] would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in [its] favor.'" Flovac, Inc. v. Airvac, Inc., 817 F.3d849, 853 (1st Cir. 2016) (quoting Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir.2010)).

The Court, in considering a motion for summary judgment, "read[s] the record in the light most favorable to the non-moving party, drawing all reasonable inferences in its favor." Merchants Ins. Co. of New Hampshire, Inc. v. U.S. Fidelity and Guar. Co., 143 F.3d at 7 (citing Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997)).

**III. Discussion**

In the Complaint, the Plaintiffs allege that RIAC police

officers "without forewarning and wrongfully and intentionally committed assault and battery on [Bogosian] by dragging him out of his vehicle and through the airport without his consent." Complaint ¶34. On their part, the Defendants have asserted a defense based on the doctrine of qualified immunity. Defs.' Mot. Sum. Judg. at 43 (ECF No. 33).

Under Rhode Island law, "[a]ssault has been defined as a 'physical act of a threatening nature or an offer of corporal injury which puts an individual in reasonable fear of imminent bodily harm,' and the apprehension of injury renders the defendant's act compensable." Broadley v. State, 939 A.2d 1016, 1021 (R.I.2008) (quoting Hennessey v. Pyne, 694 A.2d 691, 696 (R.I.1997)). Battery is defined as "'an act that was intended to cause, and does cause, an offensive contact with or unconsented touching of or trauma upon the body of another, thereby generally resulting in the consummation of the assault.'" Broadly v. State, 939 at 1021 (quoting Fenwick v. Oberman, 847 A.2d 852, 855 (R.I.2004)).

Defendants, however, in their role as police officers, are "privileged to use as much force as necessary to effectuate [an] arrest." Ferreira v. City of Providence, 568 F. Supp. 2d 197, 208 (R.I. 2008). This privilege "protects the officers unless and until their actions rise to the level of excessive or injustified force." Id.; (citing Rose v. Town of Concord, 971 F.Supp. 47, 51 (D. Mass

1997)("Police officers are privileged to commit a battery pursuant to a lawful arrest, but the privilege is negated by the use of excessive force.")).

In order to establish a claim of excessive force, a plaintiff is required to show "'(1) significant injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was (3) objectively unreasonable.'" Ferreira v. City of East Providence, 568 F.Supp.2d at 207 (quoting Reese v. Anderson, 926 F.2d 494, 500 (5th Cir.1991)).

The undisputed facts regarding Bogosian's claim of excessive force are limited to the described events as follows. After Bogosian was told that he was under arrest, Sergeant Hall attempted to remove Bogosian from his car by using a standard "escort" or "arm bar" hold. SUF ¶88. Bogosian's version merely characterizes the hold as "forceful;" he concedes, however, that instead of complying with repeated requests for his license and registration and for him to exit the vehicle, he was making a 911 call. Bogosian also suggests that, had he been given more time, he could have stepped out voluntarily. SDF ¶¶87, 88. Eventually, Bogosian did step out of the car, after claiming that the police officers' attempts to extract him from his car were "harming" him. SUF ¶91, SDF ¶91.

Now under arrest, Bogosian still did not identify himself, nor

11

did he offer to produce his license or registration at that time. SUF ¶¶92, 93. Officer Reis then patted Bogosian down and conducted a brief check of the passenger compartment of Bogosian's car. SUF ¶94. As Bogosian concedes, the officers never hit, punched or slapped him or touched him in any similar way, SUF ¶95; he insists, however, that he "was put in multiple holds and was pulled forcefully during the course of his arrest." SDF ¶95. Bogosian offers the same statement in response to the Defendants' representation that Officer Kingston, who was assisting in the arrest, took Bogosian by the forearm to keep him under control (Bogosian was yelling at that time), and that Officer Kingston brought Bogosian through the terminal to the police station at the back of the airport. SUF ¶¶96-98, SDF ¶97-98. Although Bogosian insists that the officers forced him to move quickly, he does not deny that he used his body to stop both officers in their tracks. SUF ¶99, SDF ¶99.

Within five and a half minutes of delivering Bogosian to the police station, Officer Kingston returned to his traffic duties and had no further interaction with Bogosian. SUF ¶¶100-102. Sergeant Hall also had no further interaction with Bogosian.[3] SUF ¶107.

---

[3] In response to this undisputed statement, Bogosian suggests that "one of the officers" denied his request for an attorney and that Officer Reis made a lewd remark regarding Bogosian's wife. SDF ¶107.

Bogosian was released three hours after his arrest; he did not go to the hospital as a result of the incident; and the next day he went back to caring full-time for his child. SUF ¶¶111-113. Although Bogosian asserts that he sought care from his primary care physician as a result of these alleged injuries, it is undisputed that the first time Bogosian saw his own doctor was six weeks after the incident. SDF ¶113, SUF ¶114. According to Bogosian, he requested an ambulance after his arrest but, after being informed that he would have to be taken to the ACI overnight if he opted to take an ambulance, he signed a form refusing medical treatment. SDF ¶115. Bogosian also alleges that he sustained a laceration to his hand, bruising on his arms and right shoulder, and fingerprint impressions on his arms; he does not dispute, however, that he never obtained treatment for these alleged injuries. SDF ¶115, SUF ¶115.

None of the undisputed facts of this case support Bogosian's contention that the Defendants used excessive force when effectuating his arrest. Bogosian twice stopped his car in a restricted area without loading or unloading any luggage and without any passengers entering or exiting his car. On the lower level Arrivals area, Bogosian placed his car directly behind a clearly marked police car, again neither loading nor unloading or letting any passengers in or out of his car. As verified by the surveillance video, Bogosian's car was stopped in front of several

13

other passengers, including one with a leg cast, who appeared to be waiting to be picked up. Immediately before Officer Reis (in full uniform) approached Bogosian's car, one of the waiting passengers is seen hailing his ride and eventually getting into a car after having to walk into the street and cross in front of Bogosian's car, which was blocking direct access to the sidewalk. Bogosian's family is not seen approaching the car for about two minutes, at which point Officer Reis had already opened the driver's side car door and asked Bogosian for his license and registration.

By his own admission, Bogosian failed to identify himself or to provide the requested identification documents; instead, he dialed 911 and asked to be put through to the Superintendent of State Police. Although Bogosian insists that, had he been given more time, he would have eventually complied with the RIAC officers' requests, he does concede that he never did so, even after he exited the car. At some point, Officer Reis and Sergeant Hall can be seen reaching into the car; however, as Bogosian concedes, he eventually stepped out of the car voluntarily, claiming that their efforts to extract him from his car had "harmed" him. Bogosian's claim of excessive force is essentially limited to allegations that he was placed in "multiple holds," and that he was "pulled forcefully." There are no allegations, however, that he was hit, punched, or slapped, or touched in any similar way and Bogosian does not dispute that he used his body to slow the

14

officers down while they were transporting him to the police station. Finally, while Bogosian claims to have suffered injuries as a result of his arrest, he did not see his physician until six weeks after the incident and apparently did not require any medical treatment at all.

As previously determined by this Court on May 8, 2016, Bogosian's refusal to leave the restricted area and his subsequent refusal to produce his license and registration were in clear violation of Rhode Island law and the RIAC officers had probable cause before taking Bogosian into custody. The undisputed facts of the events leading to his arrest and his conduct during the arrest also support the Defendants' contention that Bogosian was the type of "recalcitrant" individual who required the use of "some force" to allow them to do their job. See, e.g. Cruz v. Town of N. Providence, 833 A.2d 1237, 1240 (R.I. 2003).

In sum, there is no evidence that the force used by the RIAC police officers to effectuate Bogosian's arrest and related transport was excessive or objectively unreasonable. Morever, Bogosian has not submitted evidence that would support his contention that he suffered significant injury as a result of such force. Accordingly, Bogosian's claim of assault and battery cannot withstand the Defendants' motion for summary judgment.

Because Bogosian's claim of assault and battery must be dismissed, Mrs. Bogosian's claim of loss of consortium, which is

derivative of her husband's claim of assault and battery, must be dismissed as well.

## Conclusion

For the reasons stated herein, the Defendants' motion for summary judgment on the claims of assault and battery (Count IV) and the related claim of loss of consortium (Count VII) is GRANTED. Because this Court has determined that the Defendant RIAC police officers are not liable to the Plaintiffs, the claim for negligent training and supervision against RIAC (Count VIII) must also be dismissed. The Clerk is directed to enter judgment in this case for the Defendants.

SO ORDERED.

/s/ Mary M. Lisi
Senior United States District Judge

April 27, 2017